Number 17-2901 Messrs. Murphy and Leo If it may please the court, my name is Theodore Murphy, I represent the petitioner Pablo Mejia who is seated in the back. I would respectfully reserve three minutes for rebuttal. No problem. Thank you, Your Honor. One question came up that your brief had said that the bringing of the brother into the United States was in 2014, but the BIA said it was in 2013. Reviewing the facts of the case, Your Honor, I believe that it was in 2015, looking at the brother's document, June of 2015, that is the day that he left his country to come into the United States. So if there was confusion with the board, it may have been a typo with respect to that, but the documentation that had been provided to the court, I believe shows that it was 2015, the summer of 2015. The daughters were brought in during 2015, I believe it was in October of 2016. Both of those were during the time that proceedings had already commenced. Proceedings had commenced. So if you could, whatever that document is that notes that it's 2015 rather than 2013, as the board says, could you supply that to us, please? Yes, I will, if we could do that after the argument. Well, not today. Not today is fine. Just at the end. What was the 1254 is what existed previously, is that correct? That is correct, Your Honor. And how was it construed? In terms of with respect to good moral character? Yes. There are two periods that are required, well, two issues that are there, continuous presence and good moral character. The previous version of the statute, suspension of deportation, provided those both together. It very clearly stated that continuous presence prior to the filing of the application and good moral character during such a period. That language appears in a couple of other different provisions of the statute as well. There are a number of provisions that provide relief in the immigration court. Cancellation of removal for non-permanent residents, naturalization under Section 316 of the Immigration Act, and the prior Section 244 of the Immigration Act, which is the suspension of deportation, provide both for a period of continuous presence and good moral character. And each one of those, those two periods were linked together, inextricably linked together in all of those provisions. It wasn't until Congress changed the law in 1996 with the passage of Iowa, the illegal immigration reframing. But even before, it did say that you had to have good moral character throughout. That was an interpretation by the board in Matter of Castro, a decision from 1988, which predates the change of the law in 1996. And the new law did not change the continuing presence. There's nothing in the language that would change the continuing presence understanding. Am I right in that or am I wrong about that? Your Honor, there were parameters which set forth in Section 240A, D and Parens, which sets forth parameters for continuous presence, including the stop time rule, and also treatment of certain breaks in presence. So those parameters did not exist before. What Congress was trying to do was cure an ill from the practice that had been put in place in the immigration courts previously, where the immigration courts considered the application that was filed to be a continuing application up until the time of decision by the judge or if there was an appeal through the time that the Board of Immigration Appeals made the decision. So that practice, where an individual may have come into the country and then been placed into proceedings three or four years after they came in, or five years, where they did not yet have the requisite seven years for suspension and deportation, where the immigration judges would then continue the case to a date after which they would have approved the seven years of continuous presence. And much of the court decisions that come out, I think, don't differentiate between the period of continuous presence and the period of good moral character because they're linked together in all of those proceedings. The language of the statute is clear during such period. We have similar language here with respect to continuous presence and good moral character, where the provision, this is under 8 U.S.C. 1229b, the Attorney General may cancel removal of an alien admitted for permanent residence, and it goes down to one of, well, four provisions that are connected with and. It includes physical presence for a continuous period of not less than ten years, immediately pre-segmented date of the application. And then the second part is, has been a person of good moral character during such period. They're contained in the same sentence. So that phrase, during such period, relates back to the period that's defined in Part A of that, which says a continuous period of not less than ten years. The parameters that are put in place, including the stop time rule, provide two different parts, the termination of continuous presence and treatment of certain breaks. So those provide parameters for when that period of ten years ends and also when the period of ten years begins. So when we look at the definition where it says a person of good moral character during such period, we're bound by that ten-year period with the parameters that are in place. The language immediately preceding the date of such application is also a parameter that's provided there. If we look at another section in the Immigration Act, Section 316 of the Immigration Act, which is 8 U.S.C. Section 1427, that's the section for naturalization. It has three requirements, a period of continuous presence, immediately preceding the date of filing the application, a second period, which is from the date of the application to the time of admission to citizenship, and then a period of good moral character is required during all periods referenced there. The difference there is that Congress clearly spelled out that there were two different periods of time that they wanted good moral character to apply to, a period before the application is filed and a period after the application is filed up until the time of admission. So that period from the date of the application up until the time of the admission is akin to what we have here in removal proceedings, where notice to appear is served. What do you mean after the application is filed until the time of admission? You mean until the time of decision? Correct. So the naturalization process from the time of application up until admission to citizenship is a period of time in which you go to an interview, the application is reviewed, there's questioning, and then they make a decision on the application, and you're supposed to have good moral character and continuous presence up until the time that you actually take the oath of admission. So that oath of admission is the conclusion of that process. If we look at the removal proceedings and the filing of the application, there's also two periods of time. One ends when the notice to appear is served, provided to the alien, and also a period of time afterwards. Those provisions existed in the law under the suspension of deportation and under the naturalization statute prior to Congress changing the law in 1996. So through that... Counsel, let me ask a question here. Is it your position that conduct after the time the application is filed, on behalf of your client, that it's just up to whether he can be naturalized? No, Your Honor. With the particular case here, the conduct in this particular case, occurring after removal proceedings start, is a matter of discretion. It should always be taken into account. So if there are bad acts that take place after the 10-year period and during the time of adjudication in front of the court, this is a discretionary application, and bad acts should always be taken into consideration. Just the same as any acts that take place prior to the 10-year period should also be taken into consideration for matters of discretion. The linkage between continuous presence and good moral character has been the rule, and that, I believe, is the intent of Congress. If you look at the language of the suspension statute, the naturalization statute, and here even within the cancellation statute itself, we have three different provisions. We have a provision for cancellation of removal for lawful permanent residence, which does not require good moral character at all. Then the provision for cancellation of removal for non-permanent residence, which requires both a period of 10 years of continuous presence and a period of 10 years of good moral character. The next provision after that is a provision for cancellation of removal for victims of domestic violence, which has a three-year period of continuous presence and a period of good moral character during such a period. Counsel? Yes, Your Honor. Let me ask you this. What's your best case in support of your position here? Do you have one? Are they all against you? They're all against, Your Honor. There are three circuit court decisions out of the Fifth, Seventh, and Ninth Circuits that all rely on the decision from the Board of Immigration Appeals on Ortega-Cabrera, which was decided in 2005. Ortega-Cabrera focuses on a case from 1988. But what they're doing is they're giving Chevron deference, too. And then the question becomes if there's some ambiguity and the Board decides in this respect against you, is the Board decision reasonable? How is the Board decision here? And it appears that there is some ambiguity in light of the statute and the stop-time rule. So in that context, how is the Board decision unreasonable? Your Honor, Chevron points to this, that if the decision is arbitrary or capricious or manifestly contrary to the language of the statute, that you find that the Board's decision is not reasonable. And you pretty much have to rely on the second one, right? I mean, it's hard to say something's arbitrary and capricious when they say that in connection with an application, you have to have good moral character up to the time of the application being ruled on because you don't want somebody to get seven and then later ten years and then after that does all kinds of things and yet somehow is deemed to have good moral character because they don't fit technically within the seven- or ten-year period. So you would then have to say, you would seem here that you have to say that this is against the language of the actual enactment that I read. We believe it's manifestly contrary to the statute, Your Honor. When you look at the statute... But doesn't the stop-time rule create an ambiguity? I don't believe that it does, Your Honor. If we look at the stop-time rule as a parameter, and it's included in how you treat the period of continuous presence. You have the stop-time rule. You have the treatment of certain breaks in presence, which would set the front end of that ten-year period. And also the phrase that the Board of Immigration Appeals was focused on in Cabrera-Ortega is that phrase, immediately preceding the date of the application. So that's what we look at. But immediately preceding the date of the application is a parameter. They are just the same as the stop-time rule and just the same as the treatment of certain breaks in presence. So the language of the statute says a good moral character during such a period. That period is that ten-year period with all the parameters put in place with the Immigration Act, the parameters that includes the stop-time rule, that includes the period of time immediately preceding the filing of the application, and treatments of certain breaks in presence, which can form the front end of that ten-year period. The phrase, immediately preceding the date of application, doesn't mean the date that they actually file the application. It means the ten-year period prior to filing. That should be the focus of the court in their reading of the statute. The immediately preceding the application can be viewed as the period of time, the ten-year period of time. If the individual had been in the United States for 15 years prior to the beginning of proceedings, the court, the statute, wants you to focus on the ten-year part of that 15 years that precedes proceedings, that precedes the filing of the application. The application can only be filed in the removal of proceedings itself. Rather than the beginning of the first three years. So the BIA was just off base when it said that Congress could not have intended this? I believe so, Your Honor. I believe so. If you look at the language that they focused on, that Ortega Cabrera in 2005 focused on, they looked at the decision for a matter of Castro from 1988, which is nine years, eight years prior to enactment of IRA-IRA. And there, the board had been looking at this period as a continuing application up through the time of adjudication by the judge or by the board. The language of the statute doesn't provide for that. I believe the board had replaced their own interpretation for the language of the statute immediately preceding the date of the application. And that is what they counseled against. In Ortega Cabrera, they believed that if you linked the two periods together so that they're coterminous, that it renders that statement immediately preceding the date of the application as meaningless. And so the rules of statutory interpretation were supposed to provide meaning to all of the language of the statute. I believe that our reading of the statute does that when you look at that as the 10-year period before you file the application as opposed to the 10-year period after the application is filed. All right. Well, we'll hear from Mr. Leo, and then we'll get you back on rebuttal. Thank you, Your Honor. Good morning, and may it please the Court. Attorney Sabatino F. Leo on behalf of the United States Attorney General. I think what is abundantly clear in this particular case is that it is the creation of 240A as part of IRERA, the stop-time rule, that actually creates the ambiguity. And I think Judge Ambrose hits the nail on the head specifically when we discuss 240A in the context of the stop-time rule, creating the ambiguity in 240 for purposes of cancellation of removal, and specifically relating that to the cancellation or to the good moral character provision for 10 years. I think the argument that your counsel, your opposing counsel, is saying is look at the actual text of the 240A, and it has been physically present in the U.S. for a continuous period of not less than 10 years, immediately preceding the date of the application. That is correct. That's pretty clear. So it's a look back from the date of the application. And looking at those words in a vacuum, Your Honor, I would agree with that argument. But what we have here, what we didn't have for purposes of Castro in 1988, in which I think Petitioner's counsel relies on heavily, heavily is we did not have a stop-time rule. Congress coming in and specifically delineating what that period of time for purposes of continuous physical presence, when that in fact ceases. And for purposes here, it's with the filing of the notice to appear. And as a result, that creates the ambiguity preceding the date of such application, somewhat ambiguous. And then taking that further with regard to during such period for purposes of good moral character, harkening back to that language, now you have an ambiguity built on ambiguity, a totem pole ambiguity for lack of a better term. You have an ambiguity here for purposes of good moral character. And as a result, what the board does here is say, yes, for purposes of suspension of deportation in 1988, these did act coterminously, so to speak. They were moving in tandem. However, what Congress in fact did here was upend the apple cart, so to speak, with regard to the continuous physical presence. And what is important to recognize in 248, the stop-time rule, is Congress specifically delineates that continuous physical presence will stop with the filing of a notice to appear. So Congress understanding that they were applying now this hard date in time for purposes of the cessation of an individual's continuous physical presence. And that's why I think the board comes in in Ortega Cabrera and says, okay, now we have to take a look. What does that in fact mean for purposes of good moral character in that language I think Your Honor is looking at during such period? Well, it creates that ambiguity. And as a result, we need to fill those holes in that ambiguity. And for purposes here, the only way to properly fill that ambiguity is really to look at the entire Immigration Nationality Act as a whole, specifically for purposes of what are per se good moral character cancellations for an individual not having good moral character for purposes of cancellation 101F. And what the board does, and it does a very good job, and I think the Fifth and the Seventh and the Ninth recognize that, and it says, well, let's take a look at what the INA says about good moral character. Well, we have situations in which an individual testifies falsely for the purposes of accruing immigration benefits, that that is per se lacking good moral character. I think that's why it takes it out of petitioner's argument with regard to, well, that's just discretion. Well, that's not what the case law with regard to 101F says, and that is specifically not what the law says, because these are specifically per se categories. And I think what the BIA says, well, if we read that provision to stop and be, again, coterminous, as it was with suspension of deportation, we are in a situation in which the language of 101F, particularly they were relying on 101F6, testimony that an individual could be testifying at his or her hearing for purposes of cancellation of removal, falsely testify, and that would not be a per se, via per se, lack of good moral character under the statute. And the board looked at that and said, that's clearly not what Congress intended for this purpose. And I think what's also important to recognize is how specific 248 is as a matter of the stopped time rule. I heard petitioner's counsel mention with regard to battered spouses and those issues, but those are specifically extracted for purposes of the stopped time rule with regard to the battered spouses in that particular section. And I think what Congress did was pretty clear in saying that for purposes of continuous physical presence, your presence will cease with the filing of a notice to appear. Once you're filing, that continuation now ceases. It said nothing, and it could have, and the legislative history could have spoken to that. And the Congress had the opportunity to do that, and it did not. And I think that's really what's important. I have a question. Yes, Your Honor. Congress was very clear in that at the same time they were saying there was an ambiguity in the statute. Which one are you pushing? Well, I think for purposes of the stopped time rule, 248D, they were clear in saying continuous physical presence, your continuous physical presence ceases with the filing of a notice to appear. What it did not go back into, what it did not, I guess, comprehend at that particular time, is that it was creating the ambiguity for purposes of 240A, B1, with respect to cancellation of removal and satisfying those provisions, specifically that language preceding the date of such application. So what 240A does for the stopped time rule is it places it in another rule that suspension of deportation did not have, which then, in fact, created the ambiguity, even though the language was relatively similar, for purposes of suspension of deportation with regard to the Cabrera, with regard to the Castro case in 1988. And I think that's where the Board does a very effective job in saying, okay, we understand that these moved coterminously previously, but Congress now created the stopped time rule statute, which is clear for purposes of continuous physical presence, that first provision of cancellation of removal. But it creates the ambiguity with regard to the language of preceding the date of such application during such period. And the Board, as I believe it's authorized to do in this particular situation, and was able to do, was fill that ambiguity. And I think what the Fifth and the Seventh and the Ninth do is they look at it and they apply, at least the Fifth and the Seventh apply specific Chevron deference to the Board's decision in Ortega-Cabrera and says, there is an ambiguity and this is a permissive construction of the law because the principles of statutory construction here are, well, let's take the law of the Immigration and Nationality Act as a whole. And that's what they did is they looked at it. Excuse me, are they actually rewriting the statute? Or are they doing more than just interpreting? Are they actually rewriting the statute? I don't believe so. I mean, obviously, that wouldn't be not with the purview of their ability to do such, Your Honor. And I think what they're doing is they're based upon the stopped time rule. They're now interpreting an ambiguity, which on the Chevron, the Supreme Court says the agency may do so. Now, again, we spoke of parameters, right, parameters with respect to from petitioner's counsel. Yes, there are parameters with respect to an agency's interpretation of a statute in which it enforces and whether or not that's a permissible construction of the statute. And I think if you look at it in the context of what we have here, specifically when they're calling into 101F3, which is 101F6, which is false testimony, under the good moral character provisions of the INA, and that would be upended if it were not for this interpretation. And as a result, I don't believe as though it's arbitrary, capricious, or lacking a permissible construction of, not a permissible, a permissible construction of this particular statute. The stopped time rule applies clearly to continuous physical presence. That's correct, Your Honor. So we're then left with the next provision, which talks about good moral character. If the stopped time rule applies to X, what makes you think it applies to Y, the good moral character? Well, and... Let me, again, let me start. Locate this text for me. Yes, and I am clearly not being as clear as I need to be. I think for purposes of the stopped time rule, the language of it says unequivocally, continuous residence, continuous physical presence shall be deemed to end, dot, dot, dot, with refiling of a notice to appear. Now, we take that back to 240A, and what it makes, what the stopped time rule makes ambiguous in 240A, D1A, is that language that says preceding the date of such application. So what it does is it's specifically applying solely to continuous physical presence. So that language is somewhat ambiguous. So now you come back to good moral character, which now says during such period. Well, let's look up. Let's look at that previous provision, during such period. During such period means preceding the date of such application. However, that was where the ambiguity was as a result of 240A. Ortega-Cabrera says that good moral character period ends when there is a final administrative decision rather than when the application is filed. We've been talking about when the application is filed. So what gives, what supports the decision of the BIA that it really isn't application filed, but rather is final administrative decision? I think based upon the board's interpretation of the INA as a whole and what it specifically meant, I think the board looked at it and said that preceding the date of such application, that that language was in essence ambiguous. And during such period, we had to, in order to interpret the INA here, we had to make a determination of when it stops. And the final administrative decision makes sense with respect to the other provisions of the Immigration Nationality Act specifically regarding good moral character provisions, as I mentioned, under 101F. Because it would not make sense if the filing of such application, you filed that application, and then subsequent to that application, during immigration court, you now testified falsely in support of that application. And what that rule would in essence say is that the judge could not find you lacking good moral character under 101F6 for purposes of false testimony because the date of good moral character would have to stop. And what I think the BIA did is look back again tonight to the suspension of deportation proceedings, which actually found them to run coterminously until the final administrative decision. So I think that that was the logical next step with regard to filling these holes of ambiguity for purposes of good moral character, specifically with regard to when is there a final date. There has to be a date here. And when reading the INA as a whole, it only made sense. And I think that's what the Fifth and the Seventh specifically, because they specifically flesh it out and give it Chevron deference and talk about specifically what the board did here on Otayga-Cabrera and looked at it and said that is really the only way to look at this particular statute in light of the stop time rule, which again upended that proceeding in the date of such application language, A248, for purposes of cancellation of removal. So as a result of yours, I think there's really only one conclusion here. I mean, I think this court should afford Chevron deference to the Otayga-Cabrera decision with respect to the stop time rule, its application, but specifically with regard to good moral character and that the date for good moral character is a continuing date up until the final administrative decision for purposes of the application. And I think as a result, the board's decisions here in Otayga-Cabrera specifically are not arbitrary, capricious, manifestly contrary to law. I just don't see how any argument can be made with regard to that when we do have our sister courts here in the Fifth and the Seventh giving Chevron deference. Again, the argument that exists on the other side is that you have clear language talking about preceding the date of such application. So that's supposedly, if you're looking at it fresh, the day you apply, that has been a good person, a person of good moral character during such period, so you would look back seemingly from the date of the application. Basically, what the decisions so far are doing are reading out such application. I think you're right. They're doing it, and what they're doing is they're looking at the stop time rule, what it does to that preceding such date of application language, and as a result creates an ambiguity, makes that language ambiguous in that sense. As a result, when you're looking at the good moral character language of the statute during such period, now you're looking up and you're looking for, okay, what is during such period, what does that mean? Well, Congress effectively scrapped that language in a sense by creating the stop time rule, and there's that ambiguity. So looking at it as a whole, we're talking really about the canons of statutory construction here. We're looking at the statute as a whole, what the INA says, what it means, how to properly interpret the statute, and as a result, if we didn't have the 248, we wouldn't be here. If we didn't have the stop time rule, we wouldn't be here. If it was previous, like suspension of deportation, we probably wouldn't be here because of it. The stop time rule is really, I think that's what we effectively state in our brief or my colleague's brief, is that that really created this ambiguity. So you can bracket that language preceding the date of such application. However, you can't bracket that language outside of the stop time rule, which creates that ambiguity, and as a result, we stand here with regard to the Board of Immigration Appeals, as its duty to do so is really to interpret an ambiguous statute that it has authority to do so here, and it was neither arbitrary nor capricious. I have a question. Yes, Your Honor. What happens if you lose on this case, can the agency consider this conduct rather down the road on the applicant or is he home free? Well, the agency always has a discretionary determination, this discretionary ability to deny cancellation of removal as a matter of discretion. So the argument would be, yes, it can do so as a matter of discretion, but for purposes of good moral character in that particular time frame, I think their hands would be bound by the particular time frame. We'd have a circuit split at this point, so there'd be another people bigger and stronger than me would make that determination, but we'd have a circuit split at that particular point. But the answer to your question is, if the courts came down and said, 10 years stop at the filing of the NTA, then if an individual testified falsely at an immigration hearing, they couldn't be denied for purposes under 101F3 for false testimony. They may be denied for purposes of discretionary determination. So it doesn't just go away and be home free, but I think that that's really kind of outside the parameters, talking about parameters again of where we're here, is really is there ambiguity? And I think the agency, the attorney general here truly believes there is and that the board had the gap-filling authority to do so here. You know, couldn't we conclude that Congress intended for it to be considered that way after the 10 years is run, considered it under the discretionary authority? Oh, I will. When we talk as a matter of discretion, the court wouldn't have jurisdiction here, right, of discretionary determination by the agency, but just assuming argument for the purposes of this situation, whether or not. I don't feel that there's no limitations with regard to discretionary determination under the statute for purposes of denying cancellation. We have an individual here that may have not disqualifying crimes or may have satisfied every other provision of 248 for cancellation of removal, but it might have some crimes. And as a matter of discretion, the agency might deny cancellation of removal of that, and that would end it there, assuming there was a constitutional question or question of law that implemented this court's jurisdiction. But for purposes of those 10 years and good moral character, I mean, if the court was going to deny under that provision, if this court would say, hey, it stops at the NTA, then subsequent to that the agency couldn't deny it as such. In the past there have been, down through today, a lot of discussion, a lot of contention with regard to whether Chevron should continue. I mean, we had a judge, a colleague of Judge Sirica's and my, Judge Weiss, God rest his soul, who was adequately opposed to Chevron. And you now have a new member of the Supreme Court who has had some difficulties with regard to Chevron deference. Maybe this is the time to have it visited by the courts as to whether Chevron gets deference. Well, I think we're here. Of course, right, we are currently, as a Supreme Court decision on the Chevron, we are currently bound by Chevron. So other indications we have are we may be chipping away at it in the future. But as the law now stands, agencies have that ability, subject to those particular parameters. Now, should this court decide to chip away at Chevron in the future as it continues to go, so be it. I mean, of course, but I think as the current nature and state of the law with regard to allowing agencies to interpret laws that they enforce which are deemed ambiguous is, for lack of a better term, is the supreme law of the land at that particular time. Okay, thank you very much. Thank you, Your Honor. Thank you, Your Honor. Mr. Murphy. Thank you, Your Honor. What do you say to the last point, that if a statute is ambiguous, we can't go making it up, that the board gets Chevron deference and the only ways we can go around it are the two ways that you mentioned to us earlier in your opening? Your Honor, this court has already looked at Chevron deference in a case. Orozco-Velasquez decided two years ago. The same issue is before the Supreme Court right now was argued, I believe, in April. Pereira v. Sessions. We're still waiting for a decision on that. This court decided that an issue dealing with the stop time rule and the initial decision... Did that decision come out? Yeah. Did that decision come out yesterday? I'm not sure. I thought I saw something. This court has already decided, in that case Orozco-Velasquez decided March 11, 2016, that the BIA was not entitled to Chevron deference. The court found that the language of the statute was clear. So this court and the Supreme Court are already considering that issue, whether Chevron deference should stay. I don't believe it should. Your Honor, the counsel made a very clear point about looking at the definition for good moral character under Section 101F. You've got three options according to what the board said. You can look back from the date of the actual decision, and it said that there were two other options. There was a ten-year period as the physical presence period, which ends when NTA is served, and or the ten-year period ending on the date the application for cancellation or removal is first filed. And the board chose the first one that I noted, which is actually the third one they noted. The ten-year period calculated backwards from the date of the administrative decision. And, you know, it went through these, and it reasoned that each of them is problematic, and it recognized that there's a problem with the textual language. But it had to take into account the stop-time rule with respect to physical presence, and therefore it decided this is how we're going to look at it. Because, probably for a policy reason, looking back makes more sense from the time of the decision, because if you're going to exercise your discretion to grant a petition for grant cancellation or removal, then you need to have a pretty clean record up until that time. And so what gets the benefit? Let's say 2017, when this happened, back to 2007. Let's say there was something committed in 2006. 2006 doesn't count because people can rehabilitate themselves. They can turn themselves around. And from a policy perspective, that seems to make more sense than saying, hey, if it stops in 2014 and you do all kinds of bad things in 2015 and 2016, that's okay. How do you respond to that? Thank you, Your Honor. The formulation that we posited to the court would follow the first option that the Board of Immigration Appeals outlined, Ortega-Cabrera, where the periods of continuous presence and good moral character are coterminous. They ride together. So the period required for good moral character stops when the notice to appear is filed. The Board decided against that because of the good moral character issues. Section 101F does not define the period of good moral character. It does not define the period of continuous presence. The language of the statute refers to good moral character. So if it doesn't define the period and they fill in the blanks, and it's not unreasonable from a policy perspective, as I just noted, doesn't that make some sense? Your Honor, it would make sense except for this. The practice that Congress wanted to change was the continuance of the case until you met the requirements for continuous physical presence. What we have now with the application of the Ortega-Cabrera decision is that they've severed that link between continuous presence and good moral character. So that period of good moral character can continue forward and forward. Perhaps the person doesn't have 10 years of good moral character yet. Perhaps in the middle of that time, of the 10 years for continuous presence, committed some bad act where it doesn't violate the other provisions for cancellation of removal, but it's considered a violation of good moral character. So by continuing the case to another date and another date so that that period of time going backwards from the date of decision can then surpass that bad act, you may have a period of good moral character that does not even align at all with a period of continuous presence. I don't believe that was the intent of Congress at all. And so we have a practice now under Ortega-Cabrera. How do you answer my question relating to the board making a decision based on the policy that I'd rather look back 10 years to 2007, and if something was done from 2002 when Mr. Mejia-Castillo first came here to 2007, that's forgiven. But what's not forgiven is what's done most recently within the 10 years dating straight back from 2017. I believe the policy that Ortega-Cabrera takes is a bad policy. What's bad about that policy? That policy ignores the clear intent of Congress that the period of time is linked together. Whether the bad act occurs before the 10-year period or after the 10-year period is taken into as a matter of discretion as counsel for the government has conceded. Whether the policy is that you allow bad acts to happen before or after, those are all taken into as a matter of discretion. Because a person commits a bad act outside that period of time doesn't mean they're going to have the application granted. As a matter of discretion, it can still be held against that person and the application denied. The period of time are linked together. The policy should not override the clear intent of Congress to have those two linked together. Congress did not include the term good moral character in 240 AD 1. Am I correct about that? That is correct, Your Honor. Is that significant? I believe it is. There are several provisions of the act that do not require good moral character. Cancellation of removal for permanent residence does not require good moral character. The only prohibition there is, well, you have to have a period of continuous present and you cannot have been convicted of an aggravated felony during that time. Application for adjustment of status under Section 245 of the act does not require good moral character, but it also comes with waivers for criminal activity, waivers for fraud or willful misrepresentation, waivers for unlawful presence in the United States. So different provisions of the act do not require good moral character at all. One provision that Ortega-Cabrera looked at was a voluntary application. There's two forms of voluntary departure. One is at the pre-conclusion stage where you do not have to show good moral character at all. The one that the court in Ortega-Cabrera looked at was at the conclusion of proceedings that requires a period of continuous presence of one year in the United States and a period of five years of good moral character. That is not a paper application. That's not filed at the beginning of proceedings. That is actually an oral application that is made at the end of proceedings, whether it's pre-conclusion or conclusion. If the individual decides that they just want to leave the United States, they can make that application before the judge orally. There are certain requirements for that, that they are able to pay for their transportation outside the United States, that they're willing to leave, and that they have the means to do that, that they have a travel document. So the focus by the board in Ortega-Cabrera on voluntary departure at the conclusion of proceedings is different from what we have here with cancellation or removal. Yes, it does require a period of continuous presence and a period of voluntary departure. They're linked together, but it's a different type of application where it's done orally at that final hearing, whether it's a master calendar hearing early on in the process or the final individual hearing on the trial. Mr. Lear was asked by Judge Seiler what happens if you don't prevail on this case. Same question to you. What is the next step? Are there any options if you don't prevail on this issue? Petition for certiorari will be an option in this particular case. Factually, what we have in the case below with the immigration judge is an individual who was not running a smuggling ring. He wasn't profiteering from smuggling. He brought his minor age brother into the United States. He was made to discretion, which we can't deal with that. Understood. I wanted to compare Ortega-Cabrera with the case at hand here, where there was a smuggling act in Ortega-Cabrera prior to the 10-year period, according to the board's decision, and a smuggling act in our case, which is after issuance of the NTA, which we believe is outside the time period. In Ortega-Cabrera, I believe they wanted to grant the case, and the only way they could do that, the stop-time rule would have triggered inability for that person to get cancellation of a move because he did not have 10 years. But what you're dealing with, regardless of the facts, what you're dealing with is the legal principle of Ortega-Cabrera. Correct. And the question is, does it get Chevron deference? My answer is no, it should not because it's manifestly contrary to the statute. We believe it's counter-textual. Got it. Thank you. Thank you very much. Thank you to both counsel. Very well presented arguments. I would ask if a transcript could be prepared of this whole argument, and if the government would pick that up, if you would please. Is that okay with you? Yes. Okay. Thank you. And just coordinate afterwards. We're going to clear the courtroom.